UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) ) | Criminal No. 10-0096 (ESH) |
| MICHAEL WEAVER, | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION & ORDER

Michael Anthony Weaver has moved to dismiss the fifty-two counts in the indictment that predate his arrest on November 19, 2012, alleging that the government has violated his right to a speedy trial by failing to make diligent efforts to arrest him after his indictment, which in turn resulted in a more than two and a half year delay between indictment and arrest.[1]

### FACTS

**1. October 2009 Search through Indictment**

The Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") began to investigate Weaver in July 2008, when he was identified through phone records obtained during an investigation of another suspected drug dealer in the District of Columbia. (*See* Transcript of Motions Hearing ("Tr.") at 13, May 29, 2013.) After a year-long investigation, law enforcement obtained and executed a search warrant for Mr. Weaver's residence at 603 L Street, NE on

---

[1] Those counts include one count of unlawful possession with intent to distribute marijuana, one count of unlawful possession with intent to distribute marijuana within 1000 feet of a school, forty-eight counts of money laundering, and two counts of monetary transactions in property derived from specified unlawful activity, but do not include Counts 53-55, which charge unlawful possession with intent to distribute marijuana (Count 53) and simple possession of a controlled substance (Counts 54 and 55). (*See* Superseding Indictment [ECF No. 17].)

1

October 21, 2009. (*See* Government's Omnibus Response to Defendant's Legal Motions ("Gov't Opp.") at 3 [ECF No. 26].) Weaver was not present during the search but law enforcement left a search warrant return in the apartment indicating the items that had been seized, which included marijuana, drug packaging materials, U.S. currency, and documents. (*See id*. at 6; Tr. at 22.)

The next day, Weaver emptied his three bank accounts at Wachovia Bank, withdrawing approximately $20,000 and closing all accounts. (*See* Tr. at 24.) On October 23, 2009, attorney Harry Tun contacted both ATF Special Agent Green and Assistant U.S. Attorney Courtney Spivey Urschel, claiming that the defendant had retained Tun to represent him. (*See id.* at 29; Government Hearing Exhibit ("Gov't Hearing Ex.") 9B at 4.) On the same date, Weaver sold a car to CarMax for $8,000 in cash. (*See* Tr. at 26.) On October 30, 2009, Agent Green was contacted by another attorney, Ross Hecht, who also claimed that he represented Weaver. (*See* Tr. at 30; Gov't Hearing Ex. 9B at 5.)

While it cannot be determined exactly when Weaver left the L Street apartment, it is undisputed that he was no longer living there in early 2010 (if not before), and that he moved to 203 R Street, NW in early 2010 and continued to reside at that address until the summer of 2012, when a flood destroyed his basement apartment.[2] (*See* Defendant's Hearing Exhibits ("Def. Hearing Exs.") 4, 5; Tr. at 115-18.) Nonetheless, Weaver filed reports dated February 5 and April 2, 2010, with his probation officer indicating that he still lived at 603 L Street, NE. (*See*

---

[2] Weaver's tenancy at the R Street apartment began on January 1, 2010, according to the lease signed by Weaver, but the PEPCO account for the apartment was not activated until April 2011. (*See* Def. Hearing Exs. 4, 5.)

Gov't Hearing Ex. 4.)[3] The reports he filed with probation on February 5 and April 2, 2010 also indicated that he still had an open bank account at Wachovia, although he had previously closed that account. (*See* Gov't Hearing Exs. 4, 5.) Weaver stopped reporting by phone and in person to his probation officer in mid-March (*see* Probation Chronological Record Report, Def. Hearing Ex. 3), and on March 22, 2010, the probation officer tried but was unable to reach Weaver by phone. (*See id*.)

On April 13, 2010, a magistrate judge of this Court issued an arrest warrant, and on April 15, 2010, Weaver was indicted. (*See* Gov't Opp. at 9.) Also, on April 15, 2010, an arrest warrant was issued based on Weaver's violation of the terms of his supervised release in the Eastern District of Virginia. (*See id*. at 10.)

    **2. The Government's Efforts to Arrest Weaver**

Immediately following Weaver's indictment and the issuance of the two arrest warrants, ATF agents made efforts to arrest him. On April 20, 2010, they went to 603 L Street, NE, the address that he had continued to use in probation reports as late as April 2, 2010. (*See* Tr. at 33.) The agents learned from the couple who lived at that address that Weaver was no longer residing there. (*See id*.) Agents went by six or seven other addresses associated with Weaver, including the addresses of his children or the mother of his children. (*See id*.) The visits were made both during the day and at night. (*See id.*) Agent Green recalls speaking with someone at one of the addresses, but not at any of the other addresses, where they simply looked for Weaver or any family members, any activity, or one of the vehicles believed to be Weaver's. (*See id*. at 34.) The arrest warrant was also put into NCIC, the national crime database maintained by the FBI,

---

[3] Weaver was convicted of money laundering conspiracy in the Eastern District of Virginia and sentenced in January 2003 to sixty-three months incarceration followed by a period of three years on supervised release. *United States v. Weaver*, No. 02-cr-488.

on the day it was issued, as well as the Treasury Enforcement Communication System ("TECS"). (*See id*.)  Agent Green notified Weaver's probation officer about the arrest warrant and asked that Weaver be called in.  (*See id*. at 43; Gov't Hearing Ex. 9B at 8.)  There is no evidence in the record as to whether Weaver's probation officer tried to reach him after the indictment.

On April 22, 2010, agents contacted the MPD and requested assistance in locating Weaver using the MPD tag reader system, which could establish where in the District Weaver's cars were traveling, possibly suggesting a pattern that might indicate where he was staying.  (*See* Tr. at 53-54; Gov't Hearing Ex. 9B at 9.)  Agent Green recalls that both license plates that authorities knew about were entered into the system, although the contemporaneous records only refer to a single tag being entered.  (*See* Tr. at 55; Gov't Hearing Ex. 9B at 9.)  While the system returned a number of hits, including for the Third Street tunnel, none led agents to a specific residence.  (*See* Tr. at 55.)  On April 28, 2010, MPD reported that no tag readers in the District had read Weaver's tag since April 20, 2010, leading agents to believe that he may have left the jurisdiction. (*See* Gov't Hearing Ex. 9B at 9.)  Accordingly, on April 29, 2010, agents used the Accurint database system to determine that Weaver had a relative living in Mt. Pleasant, North Carolina.  (*See id*.)  They contacted the Cabarrus County sheriff's office and requested that officers drive by the address to check for any D.C.-registered cars.  (*See id.*; Tr. at 52-53.)  None were observed.  (*See* Gov't Hearing Ex. 9B at 9.)  In June 2010, an ATF agent went to North Carolina but did not observe any D.C.-registered cars or any other signs that Weaver was present at the address.  (*See* Tr. at 52; Gov't Hearing Ex. 9B at 9.)  At the end of June 2010, Agent Green was transferred to the New Jersey office, at which time the case was reassigned twice to other agents, and then ultimately to Agent Jeffrey Meixner in the summer of 2012. (*See* Tr. at 31-32, 59-60; Gov't Hearing Ex. 9B at 9-10.)

After this spurt of activity in April after the warrant was issued, not much else of any significance occurred for over two years. Between June 16, 2010 and July 7, 2011, the only recorded efforts to locate Weaver consisted of database searches to determine if there were any new reported addresses or information about Weaver, and a visit to this courthouse to ensure that the warrant remained active. (*See* Gov't Hearing Ex. 9B at 9-10.) On July 7, 2011, an agent went to a D.C. address on Fairmont Street, NW, where a maintenance worker informed him that Weaver "frequents [the] building." (*See id*. at 10.) Despite a notation that the agent would "make furt[]her intel checks and spot checks of apt. building," there is no evidence that such efforts were made. (*See id*.) On July 8, 2011, the same agent went by the L Street address, despite prior confirmation that Weaver no longer resided there. (*See id*.) Thereafter, the only recorded efforts made between July 8, 2011 and August 9, 2012, were checks of various databases to confirm that Weaver remained a fugitive. (*See id*.)

In the summer of 2012, Agent Meixner took over the case and restarted the investigation. (*See* Gov't Hearing Ex. 9B at 10.) On August 9, 2012, he determined that a 2003 Nissan Maxima owned by Weaver had been sold in November 2010 by an individual determined to be an associate of Weaver's. (*See* Tr. at 86; Gov't Hearing Ex. 9B at 10.) ATF obtained that person's phone records by subpoena and an intelligence analyst attempted to determine a phone number for Weaver based on the call detail records. (*See* Gov't Hearing Ex. 9B at 10.) On October 3, 2012, Agent Meixner received a list of Weaver's family and associates from his prior federal probation case, and ATF subpoenaed additional phone records relating to his family and associates. (*See id*.) ATF ascertained a phone number that they believed was being used by Weaver, although the subscriber was listed as Michael Brown with an Irvine, California billing address. (*See* Tr. at 89-90.) Suspecting a fictitious name and address, Agent Meixner applied for

5

and received a GPS order to locate where the phone was being used. (*See* Tr. at 91.) The results of that surveillance led agents to 929 Florida Avenue, NW in Washington, D.C. (*See* Tr. at 92.)

### 3. Weaver's Arrest

On November 19, 2012, ATF agents and U.S. Marshals went to the condominium apartment building located at that address. (*See* Tr. at 93.) They spoke with the building's concierge, who confirmed that Michael Weaver was living in the building and provided his apartment number. (*See* Tr. at 93-94.) The concierge also gave the officers a key to Weaver's apartment and indicated the parking spot where he kept his car. (*See* Tr. at 94.) After conducting surveillance inside the building, the officers went to the door of Weaver's apartment and began to knock. (*See id.*) Eventually they entered the apartment using the key and after a brief struggle, they arrested Weaver on the two outstanding warrants. (*See* Tr. at 96-97.)

While arresting Weaver, the agents saw and smelled a large quantity of marijuana, and on that basis, they obtained a search warrant for the apartment from a magistrate judge of this Court. (*See* Tr. at 100-03.) During the search, agents recovered, among other things, a birth certificate and social security card in the name of Roy Leando Wilson, Jr., as well as a letter from the District of Columbia DMV rejecting an application for a driver license in that name. (*See* Tr. at 104; Gov't Hearing Ex. 7.) They also recovered a social security card and credit card in the name of Joseph or Joe Lafayette, as well as a District of Columbia DMV Driver License application and a piece of paper with that name, a birthdate, a city, and names labeled as "mother" and "father." (*See* Tr. at 104; Gov't Hearing Ex. 7.)

## ANALYSIS

### I. LEGAL PRINCIPLES

A court deciding a speedy trial claim must apply a "balancing test, in which the conduct

of both the prosecution and the defendant are [sic] weighed." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The Supreme Court has directed lower courts to consider four factors: the "[l]ength of delay, the reason for delay, the defendant's assertion of his right, and prejudice to the defendant." *Id*.

"The first factor entails 'a double enquiry': First, 'simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *United States v. Tchibassa*, 452 F.3d 918, 923 (D.C. Cir. 2006) (quoting *Doggett v. United States*, 505 U.S. 647, 651-52 (1992)). Generally a delay is "'presumptively prejudicial' at least as it approaches one year," so as to trigger the *Barker* inquiry. *Doggett*, 505 U.S. at 652. "[O]nce the accused makes this threshold showing, 'the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.'" *Tchibassa*, 452 F.3d at 923 (quoting *Doggett*, 505 U.S. at 652).

"The government has an affirmative constitutional obligation to try the defendant in a timely manner, and thus, the burden is on the prosecution to explain the cause of the pre-trial delay." *United States v. Fernandes*, 618 F. Supp.2d 62, 68 (D.D.C. 2009) (internal quotation marks and citations omitted). "The Court must [] consider the reason the Government offers for the delay and assess whether the Government or the defendant is more to blame. Because '[a] defendant has no duty to bring himself to trial,' however, the Government must at least pursue the defendant with 'reasonable diligence,' a standard that demands 'serious effort.'" *United States v. Boone*, 706 F. Supp. 2d 71, 74 (D.D.C. 2010) (citing *Doggett*, 505 U.S. at 656; *Barker*,

407 U.S. at 531).

Turning to the third factor, "'although a defendant's failure to demand his right to a speedy trial weighs against him, when a defendant is ignorant of his indictment, he 'is not to be taxed for invoking his speedy trial claim only after his arrest.'" *Boone*, 706 F. Supp. 2d at 74 (quoting *Doggett*, 505 U.S. at 654-54.)

Finally, "when the Government has negligently failed to pursue the defendant with reasonable diligence, prejudice may be presumed. In addition, any particularized prejudice that the defendant can identify is also considered." *Boone*, 706 F. Supp. 2d at 74 (quoting *Doggett*, 505 U.S. at 653-54, 657-58). The Supreme Court has identified three interests in assessing prejudice: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532.

## II.   SPEEDY TRIAL ANALYSIS

The government only contests the second factor – the reason for the delay. Thus, the remaining elements under *Barker*, 407 U.S. 514, need not be addressed. Besides, there is no real question that a two-and-a-half year delay is "presumptively prejudicial" sufficient to trigger examination of the remaining *Barker* factors. *See Doggett*, 505 U.S. at 652 n.1. Ostensibly, the next step is to determine "the extent to which the delay stretches beyond the bare minimum need to trigger judicial examination of the claim." *Tchibassa*, 452 F.3d at 923 (quoting *Doggett*, 505 U.S. at 652) (internal quotations and citations omitted). In reality, this calculation rarely makes much difference. *See Fernandes*, 618 F. Supp. 2d at 68 (contrasting case finding no speedy trial violation despite an eleven-year delay with one finding a violation based on a two-year delay). But, for what it is worth, the delay in this case is neither inconsequential nor shockingly long.

The central dispute between the parties is whether the government was reasonably diligent in pursuing Weaver's arrest and how much blame for the delay may be laid at Weaver's feet. For its part, the government claims that it exercised all reasonable diligence and that the delay resulted solely from "defendant's fugitive status," that is, his "efforts to conceal his whereabouts since early 2010." (Gov't Opp. at 37.) Weaver, on the other hand, makes the case that the government was not reasonably diligent in arresting him since he would not have been hard to find had the government used the normal tools available to it and been more aggressive in its efforts. (Defendant's Motion to Dismiss the Indictment ("Mot. to Dismiss") [ECF No. 21] at 4.)

Weaver asserts that from "the time of his indictment until shortly before his arrest, [he] lived in the same community at 203 R Street NW." (*Id.*) The R Street address, where he lived for more than two years, was only ten blocks away from the L Street address searched in November 2009. (*See id.*) He also alleges that he had no knowledge of the warrant for his arrest or the indictment, as both were under seal, and that he did not flee and took no specific steps to evade arrest. (*See id.*)

As for the government's efforts, or lack thereof, Weaver argues that Agent Green had spoken with Weaver's friends and associates before testifying at the grand jury in March 2010, but he did not contact any of those individuals to locate Weaver after the April indictment. (*See id.*; Def. Reply [ECF No. 30] at 16.) Weaver alleges that Agent Green never questioned any of Weaver's family members to determine his whereabouts either. (*See* Def. Reply at 16.) He also maintains that Agent Green was aware that he frequented the Capitol Pool Checkers Club at 9th and S Streets, NW, five or six days a week, but that Agent Green never returned to that location after the warrant was issued. (*See* Mot. to Dismiss at 5.) Weaver states that his PEPCO bill and

9

the lease for 203 R Street were in his name, as evidence that he was living openly under his own name. (*See* Def. Reply at 16.) Furthermore, while the government claims it was "never able to locate" Weaver after October 22, 2009, he reported to his probation officer by phone or in person on six occasions after that date. (*See* Def. Reply at 16-17.)

Weaver argues that the remaining two *Barker* factors also weigh in his favor. First, he exercised his Sixth Amendment rights as soon as he was arrested and should not be faulted for not asserting them earlier because he was unaware of the indictment and arrest warrant, both of which remained under seal. (*See* Mot. to Dismiss at 6.) Second, he argues that the prejudice factor favors him because "[p]rejudice is presumed in cases where the delay exceeds one year and the Government has failed to exercise reasonable diligence," and because, even if the Court finds that prejudice is not presumed in this case, his defense is actually prejudiced since memories of relevant witnesses will have faded, one unidentified defense witness died in 2011, and a July 2012 flood at defendant's home destroyed records, ledgers, and customer invoices that would have been critical to his defense. (*Id.* at 7.)

The evidence developed at the motions hearing supports many of Weaver's key allegations. Agent Green testified that he did interview Tal Roberts, president of the Capitol Checkers Club, prior to the issuance of the arrest warrant, but did not speak with him again after the warrant issued. (*See* Tr. at 38.) Roberts testified that he told Agent Green that Weaver frequented the Checkers Club (and according to Roberts, Weaver continued to go there to play checkers during the period from 2010 through 2012). (*See id.* at 126-27.) Agent Green did not recall being told that Weaver was at the Checkers Club five or six nights a week, but he knew at least that Weaver had done some repair work at the Club. (*See id.* at 42.) Green conceded that he only visited the Checkers Club once, but could not recall if that visit was before or after the

warrant issued.  (*See id*.)  Agent Green likewise conceded that he interviewed Jose Reyes, for whom Weaver had worked, during his pre-warrant investigation, but did not contact him again after the arrest warrant was issued.  (*See id*. at 39.)  Agent Green testified that he had spoken to someone at one of the addresses that he visited while searching for Weaver, but did not specify if that person was a family member or associate of Weaver's.  (*See* Tr. at 34.)  There is no evidence that any agent attempted to speak to any other family or friend after April 2010.  (*See* Tr. at 155 (Agent Meixner conceding that he never talked to any witnesses or associates of Weaver's).)

Nor did Agent Green subpoena PEPCO bills in Weaver's name after the arrest warrant issued,[4] although ATF had done precisely that during the investigation leading up to the execution of the search warrant at 603 L Street, NE.  (*See id*. at 43.)  Nor did the government appear to follow up to determine whether Weaver still used the same cell phone number he had used when he was reporting to probation.[5]  Weaver also introduced evidence that during the time period in question, he was competing at (and winning) pool checkers tournaments around the country under his own name.  (*See* Tr. at 39-40; Def. Hearing Ex. 9 (Google search for "Michael Weaver Washington DC" and resulting Wikipedia page for "Pool Checkers" reflecting Weaver's wins in Atlanta, GA in 2012, Columbus, OH in 2011, Durham, NH in 2010).)  Finally, Weaver's neighbor on R Street testified that she knew him as "Mike" and eventually learned his last name, and that Weaver never asked her not to tell anybody where he was living.  (*See* Tr. at 114-15.)

---

[4] Weaver introduced PEPCO bills in his name for the R Street apartment for the dates April 1, 2011 through September 27, 2012.  (*See* Def. Ex. 4.)

[5] While it appears that Weaver may have used a different phone number at the time he was arrested in November 2012, law enforcement made no attempt to determine whether he continued to use the same number he had reported to his probation officer in 2009 and 2010. Indeed, the Court notes that the 2011-2012 PEPCO records introduced by Weaver reflect that at least as of early April 2011, Weaver was still using that same phone number.  (*See* Def. Ex. 4, Order History.)

But Weaver is not without blame. Most significantly, the Court finds that he was aware of the arrest warrant and/or the indictment. The Court credits Agent Green's testimony that he left a phone message for defense attorney Ross Hecht indicating the existence of either an arrest warrant or an indictment and stating that he "hop[ed] we could work out some sort of self-surrender or cooperation." (Tr. at 57.) This account is corroborated by contemporaneous records noting on April 22, 2010 "Defense atty., Ross Hecht, contacted AUSA Spivey and stated that WEAVER wants to self-surrender to warrant." (Gov't Hearing Ex. 9B at 9.) Furthermore, Weaver last reported to his probation officer in person in mid-March. (*See* Def. Hearing Ex. 3, Post Conviction Chronological Record Report.) The evasive actions Weaver took immediately following the October 2009 search of his L Street residence – selling a vehicle, emptying his bank accounts, and moving to a new address while continuing to report the L Street address to probation – are also relevant, although not conclusive, as there was no arrest warrant or indictment at that time. The Court also takes into account the identification documents for two other individuals that were found at 929 Florida Avenue, NW, but does not find them to be compelling evidence of evasion in the absence of any indication that Weaver actually held himself out under either name. On the contrary, he signed a lease at R Street in his own name, he maintained a PEPCO account in his name, and he frequently played checkers at a local club and competed at national tournaments using his own name. (*See* Def. Hearing Exs. 4, 5; Def. Hearing Ex. 10, 'Crown Me' book at 56-59.)

Because this is an unusually close case, it is useful to compare the instant facts to those of another recent case in this jurisdiction. In *United States v. Boone*, 706 F. Supp. 2d 71, the Court held that a delay of more than four years between indictment and arrest violated the defendant's Speedy Trial right. In that case, the Court held that "[e]ven if [it]were to conclude that there is

evidence to establish that Boone sought to evade arrest, the majority of the blame lies with the Government for its failure to exercise reasonable diligence in arresting Boone." *Id*.  There, the "MPD relied chiefly on the efforts of one – and only one – police officer to locate Defendant," and that officer's affirmative efforts to locate the defendant consisted of two acts of surveillance shortly after the indictment, "broad surveillance of the neighborhood 'on multiple occasions' and 'at least ten' inquiries of confidential sources." *Id*.

Notably, the Court faulted the government for "produc[ing] no evidence indicating that it put forth 'serious effort' to find and arrest Boone, such as by conducting a stake-out of the residences associated with him." *Id*.  The government presented no evidence as to what, if any, efforts were made to question the individuals arrested as a result of the same investigation regarding the defendant's whereabouts, and no evidence that it reached out to government agencies or other institutions to determine where the defendant was receiving mail. *See id.*  The Court concluded, "Given these facts, and given the wide-ranging resources commanded by MPD, the Court cannot conclude that the Government was reasonably diligent in arresting Boone in the four years after his indictment." *Id*. at 77.  Regarding the defendant's role, the court found that he was "not blameless," and in particular, "appears to have known that an arrest warrant was issued." *Id*. at 71.  The Court emphasized, however, that "there is no evidence that he sought to frustrate the government's efforts at securing his return," noting that if he had, he would have "[borne] the brunt of the responsibility for a delay." *Id. See also Fernandes*, 618 F. Supp. 2d at 71.

In the instant case, law enforcement did initially undertake serious efforts over several weeks to locate Weaver, while he did not exactly make it easy for them to find him.  However, although multiple agents worked to track him down at various points, their surveillance and

inquiries for the first 30 out of the 32 months it took them to find him were more limited than the officer's efforts in *Boone*. *See id.* They failed to take fundamental steps, such as contacting individuals with whom agents had previously spoken or subpoenaing Weaver's PEPCO or phone records, as they had during their pre-indictment investigation. (*See* Gov't Hearing Ex. 9B at 1.) Agents apparently did a series of drive-bys at various addresses looking for Weaver's car, but there is no evidence that they undertook stake-outs or more intensive forms of surveillance. (*See, e.g.*, Tr. at 140-41.) Furthermore, there were two separate periods of nearly 13 months each, during which the only efforts made were searching databases for new information on Weaver, (*see* Gov't Hearing Ex. 9B at 8-10), but "[e]ntering a criminal defendant's name into a database is a routine matter and does not satisfy the government's diligence obligation." *Fernandes*, 618 F. Supp. 2d at 70 (citing *United States v. Mendoza*, 530 F. 3d 758, 763-64 (9th Cir. 2008)). The only efforts dividing those periods of inactivity were two visits to locations associated with Weaver, including one to 603 L Street, NE, which agents had verified more than a year before was no longer where Weaver resided. (*See id.*)

Notably, the manner in which Weaver was ultimately located, by reviewing the phone records of a known relation and using GPS to locate Weaver's phone, is something that could have just as easily been done more than two years before. It is difficult to understand why it took the agents two years to obtain the list of Weaver's family and associates that existed in the records of his prior federal case and why they did not learn of the 2010 sale of Weaver's car until August 9, 2012. (*See* Ex. 9B at 10.) From the time that information was received until his arrest was a mere six weeks. However, those six weeks of investigation occurred in 2012, not in 2010, as should have been the case. While it is clear that the government's efforts need not be "heroic," *United States v. Sandoval*, 990 F.2d 481, 485 (9th Cir. 1993) (citation omitted), the

question is whether the government has made reasonable efforts. In this case, the numerous steps that the government could have taken but did not, suggest a decidedly dilatory approach to their constitutional obligation to bring Weaver to trial. The government's efforts were too few and largely ineffectual. In sum, the Court concludes that the government was negligent for not arresting Weaver until two and a half years after his indictment. As the Supreme Court has stated, "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Doggett*, 505 U.S. at 657.

Because it is the government's burden to arrest the defendant and to prove that it undertook diligent efforts to do so, while "[a] defendant has no duty to bring himself to trial," *Barker*, 407 U.S. at 527, the Court finds that the government has not met its burden. Thus, the second factor – the "flag all litigants seek to capture," *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986) – weighs in Weaver's favor. *See Fernandes*, 618 F. Supp. 2d at 72 ("Defendant did not seek to turn himself in, nor did the government actively seek to secure his return. In that, they are equally to blame. But the burden of providing a speedy trial lies with the government, not the defendant. The prosecution therefore must explain the reason for any lengthy pre-trial delay, which it has not sufficiently done here. On these facts, then, the Court cannot conclude that the government has carried its burden on the essential cause-of-delay factor.") (citations omitted).

Although the government does not contest the third factor, it is worth mentioning that this one weighs in its favor, given the Court's finding that Weaver did know about the arrest warrant and/or the indictment in April 2010 and did not assert his speedy trial right at that point. But,

because the Court finds that the government did not exercise reasonable diligence in arresting Weaver, prejudice is presumed under prong four (and goes uncontested by the government). *See Doggett*, 505 U.S. at 653-54. Thus, in the final analysis, the Court finds that the government has failed to satisfy its Sixth Amendment obligation to provide Weaver with a speedy trial.

## CONCLUSION

For the reasons stated, Weaver's motion to dismiss is GRANTED as to Counts 1-52 and DENIED as to Counts 53-55.[6]

/s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE: June 7, 2013

---

[6] Defense counsel has conceded that the Court's ruling affects only the counts from the original indictment, not those that were added in the superseding indictment based on the November 2012 search. (*See* Tr. at 135.)